FILED
U.S. DISTRICT COURT
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
2014 DEC 30  AM 11: 05

CLERK'S OFFICE
AT BALTIMORE

RASUL MALIK BROWN,

        Petitioner,

    v.

BOBBY P. SHEARIN, et al.,

        Respondent.

BY_____*_ DEPUTY CIVIL ACTION NO. JKB-12-1807

        *

        ***

## MEMORANDUM

A response to the petition for writ of habeas corpus with exhibits was filed in the above-captioned case. The matter is now ready for dispositive review. The court finds no need for an evidentiary hearing. *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts* and Local Rule 105.6 (D. Md. 2014); *see also Fisher v. Lee*, 215 F.3d 438, 455 (4th Cir. 2000) (petitioner not entitled to a hearing under 28 U.S.C. § 2254(e)(2)). For the reasons to follow, the petition will be denied.

### Factual and Procedural History

Rasul Malik Brown was convicted of the second-degree murder of Marcus McDowell, the first-degree assault of Donovan Edwards, two counts of use of a handgun in the commission of a crime of violence, and two counts of wearing and carrying a handgun, in the Circuit Court for Baltimore City after a jury trial presided over by the Honorable John Addison Howard. ECF No. 5, Ex. 10-14, Ex. 15, pp. 15-21. The facts demonstrated during the trial, as summarized by the Court of Special Appeals of Maryland, are as follows:

> This case arises from the fatal shooting of Marcus McDowell and the assault of Donovan Edwards that occurred on January 8, 2007, in the Harford Road area of Baltimore City. Edwards testified for the State that on January 8, 2007, he was out looking to obtain marijuana when he saw Edward McCargo and McDowell, who Edwards said were selling "weed." Edwards asked McCargo if he could hold a "nickel bag" of marijuana until the next day because he "didn't have any

money," but McCargo refused. Edwards walked about three steps away, when he saw appellant walking with two other men. Appellant asked Edwards if there was any marijuana available and said he wanted "a dime." Appellant then said that he had no change and he was going to the gas station to get some. Edwards went back to McCargo and McDowell and told them that appellant was trying to get a dime bag. Because the nickel bags were big, Edwards wanted to have McCargo give appellant one nickel bag and give the other nickel bag to Edwards. McCargo agreed.

McCargo and Edwards went to meet appellant and his companions when they returned from the gas station. McCargo handed Edwards the marijuana while they were walking to meet appellant. When appellant went into his pocket, instead of coming up with the money, he came up with a black revolver and hit Edwards in the head with it. Edwards "took off," but appellant did not fire at him while he was running. Edwards stated that after taking off, it seemed to him that appellant and McCargo were wrestling. Edwards ran to McDowell and told him not to go to where the others were, because "the guy got a gun." McDowell ran there anyway, while Edwards ran up the steps. Edwards heard three shots fired. Edwards said that he heard the next morning that McDowell had been shot because it was "all over on the street."

Edwards did not talk to the police right away because he thought he would be arrested for the drugs. When Edwards heard that the police were looking for him, he went to the police station and met with two detectives. Edwards acknowledged that the first time he spoke to the police was March 1, 2007. He identified his assailant from a photographic array and wrote a statement on the back of the photo that the person in the photo was the person who hit him in the head with the gun. At trial, Edwards identified the photograph he picked as depicting the man who hit him with the gun and the statement he wrote. Edwards testified that the assailant he identified in the photographic array was in fact the appellant. He testified that he had no doubt about the identification. Edwards reported that appellant was "wearing a hoodie with some white 'spat' on it."

McCargo testified to his version of events. He testified that at around 6:00 p.m. on January 8, 2007, he was in the 5100 block of Harford Road, when he spoke to Edwards about marijuana. He gave Edwards two bags of marijuana for three other men. The three men walked past Edwards to a gas station. When they were returning, he and Edwards started to walk down to the gas station. McCargo reported that appellant hit Edwards in the head with a gun, and Edwards fled. Appellant walked toward McCargo and they "got to tousling for real," with McCargo trying to get the gun. McCargo testified that he thought that appellant wanted to rob him. McCargo reported that appellant's companions were jumping on him, and he hit the ground with his hoodie over his head. After a short time, he ran away. He then heard three shots. When he turned around, he saw

2

appellant shooting McDowell. During the trial, McCargo identified appellant as the one who shot McDowell and assaulted Edwards.

After the shooting, McCargo returned to the block and saw McDowell lying there. The police came and "grabbed [McCargo] up and took [him] down Homicide," but McCargo did not tell them "the whole story." McCargo spoke to the police again on January 23, 2007, and identified a picture of appellant. On the back of the picture he wrote, "This is the guy who shot [McDowell]." He reported that appellant was wearing a brown hoodie with print the night of the incident. On March 1, 2007, a police detective showed him a paper with six photographs. He picked out the fifth one, and signed his name and dated it. The police did not tell him who to pick out or what to write in his statement. McCargo wrote on the back of the photo, "This is him. He shot [McDowell]."

On cross-examination, McCargo conceded that he did not tell the police the whole truth and did not tell them about Edwards or about selling marijuana. A couple of weeks later, the police told him they had evidence that Edwards was involved in a drug deal and was present at the time of the incident. McCargo then told the police that he and Edwards were going to sell the three men a five dollar bag for ten dollars. McCargo denied that an altercation broke out. He testified that appellant and McDowell were both standing up before the shooting and that appellant aimed and fired the gun at McDowell's upper body. McCargo conceded that he did not initially tell the police that he saw appellant shoot McDowell.

Dr. Ana Rubio, Assistant Medical Examiner for the State of Maryland, performed the autopsy on McDowell. Dr. Rubio testified that she found a total of four gunshot wounds, five if you count entrance and exit separately, and that only the left wrist had evidence of stippling or gunshot residue. Dr. Rubio testified that the cause of death was gunshot wounds. She opined that the head wound would have been immediately or rapidly fatal.

Baltimore City Homicide Detective Vernon Parker and his partner were called about 7:06 p.m. on January 8, 2007 regarding a shooting in the 5100 Block of Harford Road. When they arrived at that location, around 7:36 p.m., McDowell had already been transported to Bayview Medical Center. They noted the blood on the sidewalk, and the area had been cordoned off with police tape. A number of officers were knocking on doors looking for witnesses. Detective Parker was advised that there was a witness, McCargo, and he had McCargo transported to the Homicide office. Around 9:00 p.m., Detective Parker was notified about a surveillance video at a Royal Farm Store in the 5100 block of Harford Road, and had an officer download footage into a CD and bring it to the Homicide Office.

Detective Parker also obtained video from a BP gas station at the other side of the block and saw a view of the same subjects as in the Royal Farms video. On

January 23, 2007, Detective Parker reinterviewed McCargo, and showed him the BP video, and McCargo identified the person in the multicolored hoodie as the individual who shot McDowell. Detective Parker downloaded a still photo from the BP video footage and had McCargo sign it and write that he was identifying the person who shot McDowell.

On February 21, 2007, Detective Parker received information that the person wearing the multicolored hoodie might frequent Dutch Village. He also received information that the person's nickname was "Blue," who they later learned to be appellant. On February 26, 2007, around noon, Detectives Parker and Diaz, along with a family member of McDowell, went to that area to look for "Blue." As they were driving on Fleetwood Avenue, they saw appellant and another man, both of whom they recognized from the gas station video. Because they had a member of McDowell's family with them, they radioed for backup and directed the uniformed officers on approaching the men. When the uniformed officers approached the men, appellant "took off running." Detective Parker's partner was able to catch appellant and arrested him. The police recovered 43 ziplock baggies of crack cocaine and $619 dollars in U.S. currency on appellant's person. A subsequent search of appellant's residence revealed a box of .38 caliber ammunition.

Appellant's companion, later identified as Keith Thomas, did not run. Thomas was wearing the same clothing he had worn in the gas station video. Thomas was also arrested and taken to the homicide office. The officers advised Thomas of his *Miranda* rights, and Thomas agreed to talk to them without counsel. Detective Parker showed Thomas a photographic array, which included a photograph of appellant. Detective Parker stated that Thomas looked at all the photos, and then he pointed to the top row, third photograph, and said "that's Blue," and that he did the shooting on Harford Road. Thomas signed his name above the photograph that depicted appellant, and on the back of the array, Thomas wrote: "I saw Blue. He did the shooting on Harford Road" and then signed it.

Thomas was subpoenaed to testify, but did not appear at trial. The trial court ruled that Thomas was unavailable and allowed the State to play for the jury Thomas' testimony from the hearing on appellant's motion to suppress. The following testimony was played:

On January 8, 2007, Thomas was in the 5100 block of Harford Road with "Blue" and "Dee," looking for marijuana. They walked to the gas station to get a blunt, and "asked some boys did they have some weed, and they say, yeah." After going to the gas station, they walked back up the street and "the boys" asked "what you all want or what ever, and we say we want some weed, and the next thing I know, the gun was pulled, and because Blue smacked him in the head. He ran. They get

4

to fighting and the next thing I know, we was fighting, and I heard shots. We turned around and we ran." When asked if he saw who fired the shots, Thomas responded, "When I turned around, I saw the boy laying down on the ground. I mean, I ain't really, I ain't really see, you know what I mean."

Thomas acknowledged that he spoke to the police on February 26, 2007. The police showed him a photographic array, and he picked out someone. He admitted that his signature was above the photograph and that the handwriting on the back of the photo said, "I saw Blue. He did the shooting Harford Road." Thomas further stated: "Well, when I turned around, the boy was laying on the ground and Blue had the gun." He acknowledged telling the police that "from what I seen, he pulled the trigger because the dude ran up behind him." After Thomas' testimony was played, the State rested. Defense counsel moved for a judgment of acquittal "on all outstanding counts," submitting on the record. The trial court denied the motion.

Appellant testified in his own defense. He stated that on January 7, 2007, he was in the 5100 block of Harford Road to find some "purple hays, a high grade, hydroponic form of marijuana." He was with Thomas and "a dude named Bucky." They rode in Bucky's car, parked a block away from the Royal Farms, and walked down Harford Road. Appellant was hungry so they went to the Royal Farms to get something to eat. After they left the Royal Farms, they began walking down Harford Road toward the BP gas station when he saw three individuals on the steps of a house. One of the men, Edwards, was walking down the steps, so appellant asked him if he knew where he could get weed, and Edwards responded, "right here." Appellant's understanding was that Edwards had some dime bags of marijuana that he could purchase for ten dollars, if appellant "couldn't find any purple down the street." Appellant and his two friends decided to meet up with McCargo and Edwards to purchase the "regular weed." Appellant stated that he saw Bucky hand ten dollars to McCargo, and around the same time, McCargo handed a bag of marijuana to Edwards. Appellant commented that upon seeing the marijuana he said "that's not a dime" size bag of marijuana. Bucky asked McCargo for his money back, and when McCargo refused, Bucky and McCargo started fighting. Appellant struck Edwards twice with his fist and Edwards takes off running. Appellant stated that he started "altercating" with McCargo when "[he] fe[lt] somebody come behind [him] and start choking [him]."

Appellant went on to say that he tried to "sling him off [his] shoulder," but was unable to. He reported that he started to get dizzy because he was "losing [his] air," and at that time, he "pulled out the gun or whatever." Appellant said that he fired over his shoulder to get his assailant off him, but his assailant grabbed the gun and he was not able to get it back. While they were "tousling" over the gun, it went off twice more. Sometime after that, he and McDowell tripped and fell to

5

the side. Appellant recounted: "The gun go off again. I get up and run up Rookard Street." Appellant further testified that, that while he was struggling with McDowell, McCargo was fighting with Bucky and Thomas. The other men met him back at the car. Appellant claimed that he had not pulled the gun during his confrontation with McCargo. He further maintained that there was no plan to rob anyone that night.

Appellant admitted that at the time of his arrest, he "took off" when he saw uniform police officers in the area, and maintained that it was because he had outstanding warrants from Baltimore County and because he had drugs on his person.

ECF No. 5, Ex. 6 at 2-9 (footnotes omitted).

Petitioner was sentenced on April 3, 2008, to 75 years of incarceration. *Id.*, Ex. 15, p.p. 13-17.

He noted a timely appeal raising the following claims in the Court of Special Appeals:

1. Did the trial court err by restricting cross-examination of a witness for the prosecution regarding his affiliation with a criminal gang?

2. Did the trial court err in admitting into evidence a video recording of the prior testimony of a witness for the prosecution, Keith Thomas?

3. Was the trial court's decision not to give a requested jury instruction concerning "Witness Promised Benefit" reversible error?

4. Is the evidence legally insufficient to sustain Appellant's convictions of second degree murder and first degree assault?

*Id.*, Ex. 4, p. 3; Exs. 5 & 6.

Petitioner's convictions were affirmed on July 27, 2011. *Id.*, Ex. 6. The court's mandate issued on November 15, 2007. *Id.* Petitioner filed a petition for writ of certiorari raising the following claims:

I. Did the Court of Special Appeal err in its ruling that the restriction in cross examination of prosecution's witness regarding affiliation with a criminal gang was harmless?

II. Was Court of Special Appeals correct in concluding it was harmless error to admit video recorded suppression hearing testimony of prosecution witness because he failed to appear for trial under court subpoena, and if so, does this deny Appellant his right to confront and cross-examine prosecution's witnesses in accordance with 6th and 14th Constitutional Amendments and Maryland Rule 5-804?

III. Was Court of Special Appeals correct in concluding that a requested jury instruction that prosecution's witness was made a promised or benefit, not a reversible error?

*Id.*, Ex. 7 (*sic*). The petition was denied on December 19, 2011. *Id.*, Ex. 8. Petitioner did not seek further review in the Supreme Court of the United States. ECF No. 1. Petitioner has not pursued state post-conviction relief. *Id.*; ECF No. 5, Ex. 1.

Here, petitioner maintains that (1) his right to cross-examine adverse witnesses was violated; (2) the trial court "refused to give jury 'witness promised benefit'" instruction; and (3) the evidence was insufficient to sustain his conviction. ECF No 1, p. 6.

**Threshold Considerations**

Timeliness & Exhaustion of State Remedies

Respondents do not contend, and the court does not find, that the petition was filed outside the one-year limitations period set forth in 28 U.S.C. § 2244(d)(1). Further, petitioner no longer has any state direct review available to him with respect to the claims now before the court; thus, the court finds the claims are exhausted for the purpose of federal habeas corpus review.

Procedural Default

Before petitioner may seek habeas relief in federal court, he must exhaust each claim presented to the federal court by pursuing remedies available in state court. *See Rose v. Lundy*, 455 U.S. 509, 521 (1982). This exhaustion requirement is satisfied by seeking review of the

7

claim in the highest state court with jurisdiction to consider the claim. *See O'Sullivan v. Boerckel*, 526 U.S. 838 (1999); 28 U.S.C. § 2254(b) and (c). In Maryland, this may be accomplished by raising certain claims on direct appeal and with other claims by way of post-conviction proceedings. Exhaustion is not required if at the time a federal habeas corpus petition is filed petitioner has no available state remedy. *See Teague v. Lane*, 489 U.S. 288, 297-98 (1989).

Where a petitioner has failed to present a claim to the highest state court with jurisdiction to hear it, whether it be by failing to raise the claim in post-conviction proceedings or on direct appeal or by failing to timely note an appeal, the procedural default doctrine applies. *See Coleman v. Thompson*, 501 U. S. 722, 749-50 (1991) (failure to note timely appeal); *Murray v. Carrier*, 477 U.S. 478 (1986) (failure to raise claim on direct appeal); *Murch v. Mottram*, 409 U.S. 41, 46 (1972) (failure to raise claim during post-conviction); *Bradley v. Davis*, 551 F. Supp. 479, 481 (D. Md. 1982) (failure to seek leave to appeal denial of post-conviction relief). The court does not find that any of petitioner's claims have been procedurally defaulted.

Standard of Review

An application for writ of habeas corpus may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). The federal habeas statute at 28 U.S.C. § 2254 sets forth a "highly deferential standard for evaluating state-court rulings." *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997); *see also Bell v. Cone*, 543 U.S. 447 (2005). This standard is "highly deferential" and "difficult to meet." *Cullen v. Pinholster*, 563 U.S. __, ___, 131 S. Ct. 1388, 1398 (2011); *see also White v. Woodall*, ___U.S.__, 134 S. Ct 1697, 1702 (2014), quoting *Harrington v. Richter*, 562 U.S. 86, __, 131 S. Ct. 770, 786-87 (2011) (state

prisoner must show state court ruling on claim presented in federal court was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits: 1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States"; or 2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).   A state adjudication is contrary to clearly established federal law under § 2254(d)(1) where the state court 1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or 2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Under the "unreasonable application" analysis under § 2254(d)(1), a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 131 S. Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "Rather, that application must be objectively unreasonable." *Id.* Thus, "an unreasonable application of federal law is different from an incorrect application of federal law." *Id.* at 785 (internal quotation marks omitted).

Further under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S.290, 301 (2010). "[E]ven if reasonable minds reviewing the

record might disagree about the finding in question," a federal habeas court may not conclude that the state court decision was based on an unreasonable determination of the facts. *Id.* "[A] federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly." *Renico v. Lett,* 599 U.S 766, 773 (2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 410 (2000)).

The habeas statute provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part." *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010). This is especially true where state courts have "resolved issues like witness credibility, which are 'factual determinations' for purposes of Section 2254(e)(1)." *Id.* at 379.

The Antiterrorism and Effective Death Penalty Act (AEDPA) erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court. AEDPA requires "a state prisoner [to] show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error ... beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86,___, 131 S. Ct. 770, 786–87 (2011). "If this standard is difficult to meet"—and it is—"that is because it was meant to be." *Id.* at 786. A federal court reviewing a habeas petition will not lightly conclude that a State's

criminal justice system has experienced the "extreme malfunctio[n]" for which federal habeas relief is the remedy. *Id.* at 786 (internal quotation marks omitted).

## Analysis

1. Denial of Right to Cross-Examine Witnesses

On direct appeal, petitioner maintained that the trial court denied him the opportunity to expose bias when he was prevented, through counsel, from asking witnesses about gang affiliations. ECF No. 5, Ex. 6, p. 10. In rejecting this claim, the Court of Special Appeals stated:

> As the decision to limit cross-examination ordinarily falls within the sound discretion of the trial court, our sole function on appellate review is to determine whether the trial judge-imposed limitations upon cross-examination that inhibited the ability of the defendant to receive a fair trial. Consistent with that discretion, we note, however, that the trial judge, and not this Court, is in the best position to determine whether the introduction of certain impeachment evidence would enmesh the trial in confusing or collateral issues. *Id.*

*Merzbacher*, 346 Md. at 413-14 (citation omitted).

In the present case, the trial court correctly applied the principles stated above. We agree with the trial court that, under the circumstances of this case, the evidence appellant sought to show would have been more prejudicial than probative. As the trial court pointed out, appellant would first have to show that the victim, McCargo, and Thomas were, in fact, members of the Bloods, and then establish that those gang members would be likely to lie to protect each other. He would then have to show that such a trait would, in fact, be in play in the present case. Appellant would have to show, for example, that gang membership in the Bloods made it more likely that the witnesses would want whoever is accused to be convicted of killing a gang member, even if the accused was or might be innocent.

Aside from those problems, a jury could make no inferences from gang membership of the victim, McCargo, and Thomas without knowing the gang affiliation, if any, of appellant. More importantly, Thomas was appellant's friend, not a friend of McCargo or the victim. Thomas' gang membership thus might cause the jury to speculate as to appellant's gang membership. In short, the

11

evidence would be marginally, if at all, relevant and would lead to the introduction of a number of extraneous issues.

*Id.* at 12-13.

Petitioner also argued, on appeal, that the trial court violated his right to confrontation when it permitted the State to introduce Thomas's prior testimony, provided during the suppression hearing, when Thomas failed to appear for trial. ECF No. 5, Ex. 4. In denying this claim the Maryland Court of Appeals stated:

> Maryland Rule 5-804(b) sets out exceptions to the hearsay rule when the declarant is unavailable. It states in pertinent part:
>
>> (b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>> (1) Former testimony. Testimony given as a witness in any action or proceeding or in a deposition taken in compliance with law in the course of any action or proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.
>
> As appellant acknowledges, it was conceded at trial that Thomas was unavailable. The question then becomes whether the defense had "an opportunity and similar motive to develop the testimony" at the suppression hearing "by direct, cross or redirect examination."
>
> **Motive And Opportunity**
>
> In *Huffington v. State*, 304 Md. 559 (1985), *cert. denied*, 478 U.S. 1023 (1986), the Court of Appeals discussed at length the rule allowing prior testimony where the declarant was unavailable:
>
>> "Our predecessors have consistently held that testimony taken at a former trial may as a general rule be admitted at a subsequent trial where it is satisfactorily shown that the witness is unavailable to testify. *Contee v. State*, 229 Md. 486 (1962); *Bryant v. State*, 207 Md. 565 (1955); *Hendrix v. State*, 200 Md. 380 (1952). These cases generally recognize that where an opportunity was afforded to the accused to cross-examine the witness at the former trial, there is no violation of the state or federal constitutional right of

12

confrontation. The rule has generally been applied without distinction between the admissibility of testimony given at a former trial and testimony given at a preliminary hearing since, as Professor McCormick states:

> 'If the accepted requirements of the administration of the oath, adequate opportunity to cross-examine on substantially the same issue, and present unavailability of the witness, are satisfied then the character of the tribunal and the form of the proceedings are immaterial, and the former testimony should be received. . . .' McCormick, Evidence § 258 (2d ed. 1972)."

Id. at 566 (quoting *Crawford v. State*, 282 Md. 210 (1978)).

The *Huffington* Court also looked to McCormick, among others, in considering the type of cross-examination that was necessary to allow the prior testimony to be admitted:

> "More important, and more often drawn in question, is the requirement that the party against whom the former testimony is now offered, or a party in like interest, must have had a reasonable opportunity to cross-examine. Actual cross-examination, of course, is not essential, if the opportunity was afforded and waived. The opportunity must have been such as to render the conduct of the cross-examination or the decision not to cross-examine meaningful in the light of the circumstances which prevail when the former testimony is offered."

*Huffington*, 304 Md. at 568 (quoting Cleary, McCormick's Handbook of the Law of Evidence, § 254 (3d ed. 1984) (citation omitted)).

In the present case, the State offered Thomas' suppression hearing testimony at trial for the limited purpose of the identification of appellant as the shooter. Appellant does not argue that under Rule 5-804(b)(1) he did not have the "opportunity" or "similar motive" to challenge Thomas' pre-trial identification of appellant. Indeed, appellant called Thomas as his own witness in an attempt to show that the pre-trial identification procedure employed by the police was impermissibly suggestive.

Appellant's argument focuses instead on his inability to question Thomas at the suppression hearing about the victim's conduct immediately prior to the shooting in an effort to adduce evidence in support of his claim of self-defense. Clearly,

evidence of self-defense was irrelevant to Thomas' pre-trial identification of appellant, and the trial court correctly sustained the State's objection to Thomas' testimony on that issue.  More importantly, during cross-examination of Thomas at the suppression hearing, the State "opened the door" to evidence of self-defense when it elicited testimony from Thomas that appellant "pulled the trigger because the dude [the victim] ran up behind him."  On redirect examination of Thomas, appellant was entitled to have Thomas explain or amplify that testimony.  *See Daniel v. State*, 132 Md. App. 576, 583, cert. denied, 361 Md. 232 (2000).  When appellant failed to conduct any redirect examination of Thomas, appellant in effect waived any right to complain that he did not have the opportunity at the suppression hearing to develop Thomas' testimony relative to the claim of self-defense.  *Cf Huffington*, 304 Md. at 568 (stating that "[a]ctual cross-examination, of course, is not essential, if the opportunity was afforded and waived') (citation omitted).

Finally, even if the admission of Thomas' suppression hearing testimony was error, we conclude that such error was harmless.  In his trial testimony, appellant admitted that he shot McDowell.  McCargo corroborated this testimony, and Edwards testified that appellant was the individual who had the gun.  Thomas' testimony was simply cumulative to such evidence.

On the issue of self-defense, Thomas' testimony from the suppression hearing that appellant "pulled the trigger because the dude ran up behind him" corroborated appellant's testimony that appellant shot McDowell when McDowell attacked him from behind.

In sum, we conclude that Thomas' testimony at the suppression hearing satisfies the requirements of Rule 5-804(b)(1), and thus was properly admitted into evidence at appellant's trial.  Even if such testimony was admitted in error, the error was harmless and therefore not reversible.

ECF No. 5, Ex. 6 at 21-24.

To the extent the court's ruling pertains to Maryland law as it relates to admission of evidence, it is not the role of this court to second guess those conclusions.  *See Rose v. Hodges* 423 U.S. 19, 21-22 (1975).  "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67- 68 (1991)

14

The appellate court's rejection of petitioner's constitutional claims survives scrutiny. The Confrontation Clause protects a defendant's literal right to confront witnesses at time of trial as well as his right to cross-examination free from restrictions which effectively emasculate the right. *Delaware v. Fensterer*, 474 U.S. 15 (1985). The right guaranteed by the Sixth Amendment to confront and cross-examine witnesses is made obligatory on states by the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400 (1965).

In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court held that the testimonial statement of a person who is not called as a witness may not be admitted against the accused for its truth unless the declarant is unavailable and the defendant had a prior opportunity to examine the witness. Here, the Maryland Rule regarding admission of testimony from an unavailable witness tracks the requirements of *Crawford*. The appellate court examined the testimony and found that the witness, Thomas, was unavailable and that petitioner had sufficient opportunity to examine the witness during the suppression hearing as to the basis for the admission of the testimony at trial. This use of Thomas's testimony did not offend the Confrontation Clause and is not a basis for habeas relief. *See Crawford*, 541 U.S. at 59 n.9; *see also Tennessee v. Street*, 471 U.S. 409, 414 (1985).

Additionally, the appellate court's rejection of petitioner's claim that the limitation of his cross-examination of witnesses regarding their gang affiliation violated his rights also withstands scrutiny. While a defendant has the fundamental right to effective cross-examination on matters bearing upon a witness's credibility, *Davis v. Alaska*, 415 U.S. 308 (1974) (right to question witness about juvenile convictions), restrictions on the scope of cross-examination are within the sound discretion of the trial judge, and trial courts are generally given wide latitude to set

15

reasonable limits to prevent harassment, prejudice, or confusion of the issues. *United States v. Ambers*, 85 F.3d 173 (4th Cir. 1996); *see also United States v. McMillon*, 14 F.3d 948, 956 (4th Cir. 1994). In rejecting petitioner's claims regarding Confrontation Clause violations the appellate court reasonably applied the law, and its determination survives scrutiny under § 2254(d).

2. Trial court's failure to issue "witness promised benefit" instruction

Petitioner maintains that the trial court erred in not issuing a "witness promised benefit" instruction, and he cites only to Maryland Rule 4-325(c) in support of his claim. ECF No. 1, p. 6. Petitioner's claim appears to be based solely upon a violation of Maryland law. In the absence of a claim of federal constitutional violation, the claim is not cognizable. *See* 28 U.S.C. § 2254(a) (a federal court may entertain a state prisoner's habeas petition "only on the ground that he is in custody in violation of the Constitution or law or treaties of the United States.") As noted, supra, to the extent the court's ruling pertains to Maryland law as it relates to jury instructions, it is not the role of this court to second guess those conclusions. *Id.*[1]

3. Insufficiency of the Evidence

Any challenge to sufficiency of evidence is necessarily a due process challenge. *West v. Wright*, 931 F.2d 262, 266 (4th Cir. 1991), *overruled on other grounds*, 505 U.S. 277 (1992). In determining whether there is sufficient evidence to support a conviction, the court examines "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U. S. 307, 319 (1979). The fact finder, rather than the reviewing court,

---

[1] The Court of Special Appeals found that petitioner was not entitled to the instruction as it found that there was no evidence that Thomas expected to benefit from the statement he provided to law enforcement. ECF No. 5, Ex. 6, p. 28. The appellate court's findings are supported by the record and shall not be disturbed.

is charged with "resolv[ing] conflicts in the testimony, [weighing] the evidence, and [drawing] reasonable inferences from basic facts to ultimate facts." *Id.* Circumstantial as well as direct evidence must be considered and the prosecution must be given the benefit of all reasonable inferences. *United States v. Tresvant,* 677 F.2d 1018, 1021 (4th Cir. 1982). Circumstantial evidence alone can be sufficient to support a conviction. *Stamper v. Muncie,* 944 F.2d 170, 174 (4th Cir. 1991).

On direct review, the intermediate appellate court found the claim had not been preserved for review. Even if preserved, the claim is without merit as the trial transcript demonstrates there was sufficient evidence for the jury to reach a guilty finding. The evidence adduced at trial demonstrated that petitioner sought to buy marijuana and arranged to purchase it with Donovan Edwards. Instead of handing Edwards the money, however, Brown struck Edwards in the head with a handgun. ECF No. 5, Ex. 11, pp. 23, 41, 52-58. A struggle followed between Donovan Edwards, Edward McCargo and Marcus McDowell on one side, and petitioner and two companions on the other. *Id.,* Ex. 11, p. 58. McCargo witnessed petitioner shoot McDowell three times while aiming the gun at the upper part of McDowell's body. *Id.,* Ex 11, p. 72-73. McDowell suffered gunshot wounds to his left shoulder, left wrist, and left side of the head, which was the fatal wound. *Id.,* Ex. 11, p. 103, 105-07, 122. The evidence would permit a trier of fact to conclude that petitioner intended to assault Edwards and intended to kill McDowell; hence, petitioner is not entitled to relief on this claim. *See* 28 U.S.C. § 2254(d).

## Conclusion

The record establishes, and this court determines, that petitioner is not entitled to federal habeas relief. There is no basis for finding constitutional deficiencies in the state court

proceedings, and petitioner has failed to rebut the presumption of correctness of the findings of fact underlying the rejection of his grounds for post-conviction relief.

Additionally, a certificate of appealability is not warranted as it may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (citation and internal quotation marks omitted), or that "the issues presented are adequate to deserve encouragement to proceed further," *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  Because this court finds that there has been no substantial showing of the denial of a constitutional right, a certificate of appealability shall be denied.  *See* 28 U.S.C. § 2253(c)(2).

Accordingly, the petition shall be dismissed with prejudice and a certificate of appealability shall not issue. A separate order follows.

Date: *Dec 29, 2014*

James K. Bredar
United States District Judge

18